## UNITED STATES FEDERAL DISTRICT COURT

## DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **BRANDI CARTER,**<br><br>    Plaintiff, | | Case No. 8:-cv- 16-_____ |
| v. | | |
| **METROPOLITAN COMMUNITY COLLEGE,**<br>a political subdivision of the State of Nebraska<br>and body corporate and politic,<br><br>    Defendant. | | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## <u>INTRODUCTION</u>

1.      Brandi Carter ("Ms. Carter") was employed for three (3) months as a faculty secretary after working four (4) years and nine (9) month as a Health and Public Services specialist at Omaha's Metropolitan Community College ("Metro").  Ms. Carter is a Caucasian female, who also has a disability.

2.      When she started her employment at Metro, Ms. Carter was a part-time, temporary employee.  She applied for and was hired for a full time position on July 23, 2014.  Ms. Carter worked as a faculty secretary for 12 professors at Metro, but principally reported to Dean Stacey Ocander.  Ms. Ocander, through her personal actions and treatment of Ms. Carter, subjected Ms. Carter to a hostile work environment based on sex and subjected Ms. Carter to more rigorous terms of employment due to Ms. Carter's disability.

3.      Ms. Carter disclosed to her employer that she was being treated more harshly than other employees and advised Metro she was diagnosed with Epstein-Barre syndrome.  Dean Ocander treated the information about Ms. Carter's diagnosis with disdain, stating it was "ridiculous."  Ms. Carter reported Ms. Ocander's conduct to Metro's Human Resources (HR) Department.

## FACTUAL BACKGROUND

4.      Ms. Carter is a Caucasian female, who was diagnosed with a disability known as Epstein-Barre syndrome.  She was employed as a faculty secretary at Metro for several years.

5.      Metro hired Ms. Carter on September 1, 2009.  Throughout her employment, Ms. Carter worked for Metro's Department of Health and Public Services, reporting to Dean Stacey Ocander.

6.      She was terminated on November 4, 2014, purportedly for "unacceptable performance" and attendance problems, despite her tenure of several years.  According to Metro's "Procedures Memorandum" from the Office of the President,

> Once the supervisor, in the exercise of his/her judgment, has determined that disciplinary action is warranted, the matter may be best handled by following this sequence of disciplinary actions: oral reprimand, written reprimand, imposed probation, imposed downgrade (non-exempt employees only), suspension and discharge.

(Human Resources Index No. VI-24, at p.6) (A true and correct copy of Index No. VI-24 is attached as Exhibit A and incorporated by this reference.)  Despite the recommendation and opportunity to impose several steps of discipline for perceived deficiencies, Dean Ocander followed none.

7.      Metro failed to discuss either of the supposedly problematic issues with Ms. Carter prior to her termination.  Out of nowhere, she was terminated without warning.[1]  She is ambitious, hardworking, and dedicated.

8.      During her tenure as Ms. Ocander's assistant, Mr. Carter was subjected to and witnessed actions by Ms. Ocander and other management members that were sexual and offensive.  Ms. Ocander was unprofessional in her treatment of Ms. Carter, as well as her co-workers, and created a hostile working environment for Ms. Carter and others.  Dean Ocander's actions and antics were ongoing and continuous and fostered an environment that was replete with sexual charges, innuendo and intimidation.

---

[1] Ms. Carter is presently working at the Omaha Police Department and is an exemplary employee, based on her performance reviews.

2

## **Dean Ocander's Harassing, Threatening and Intimidating Conduct**

9.     Starting in September 2009, Dean Ocander made statements to Ms. Carter that she "needed a vibrator."  Dean Ocander said she would take Ms. Carter "across the bridge to get one."[2]

10.     An Associate Dean, Erin Olson, would periodically walk through the office area with a plastic penis.  The plastic penis was part of a "ring toss" game that Ocander and Olson set up to be played in the office.  When Olson quit in January 2013, the ring toss game and brandishing of the plastic penis were no longer part of the daily antics.

11.     On a daily basis, Ms. Carter was subjected to Dean Ocander's lewd comments. For example:

a.   Dean Ocander often walked in an exaggerated, bowlegged manner through the office are saying she overused her vibrator the night before.

b.   Dean Ocander called the employees and staff in the office area a "bunch of hookers."

c.   Throughout Ms. Carter's tenure, Dean Ocander's standard response to comments or situation was "fuck me running."

d.   Beginning in 2012 and continuing until Ms. Carter's termination, Dean Ocander would sit in the office area near Ms. Carter's assigned desk and talk for hours about her ex-husband and his "whore" or "cunt girlfriend."

e.   Throughout Ms. Carter's employment, Dean Ocander would briefly but often lift up her skirt to expose her private parts to all the employees/staff in the office area where Ms. Carter worked.

f.   In 2014, Dean Ocander made jokes to a newly hired Metro staff member about having failed Metro's sexual harassment training.  She previously shouted out at the entire office in a self-congratulatory tone that she failed her training on sexual harassment.

---

[2] Ms. Carter understood Dean Ocander to be referring to "Council Bluffs, Iowa" as the destination that was across the bridge.

    g.   On October 1, 2014, Dean Ocander sent a group text in which she referred to her Associate Tina Pebly and Public Service Specialist Jessica Vanderloo as "ass wipes" and referred to all staff/employees as "hooker meat wipes." Dean Ocander also wrote "jerk bait keep singing for your mate, damn I can't rhythm (sic) screw it."

12.    In 2014, Ms. Carter took her complaints to Metro's Human Resources ("HR") Department and complained that she was being treated differently than a previous employee who held her same position. For example, Ms. Carter was not allowed to work through her lunch period and leave one hour earlier. Previously, Laurie Cook was allowed to work through her lunch and leave work one hour early.

13.    The Nebraska Fair Employment Practice Act (FEPA), Neb. Rev. Stat. §§ 48-1101 to 48-1126 (Reissue 2004), furthers "the policy of [Nebraska] to foster the employment of all employable persons in the state on the basis of merit ... and to safeguard their right to obtain and hold employment without discrimination." § 48-1101.

14.    Ms. Carter filed a charge of discrimination with the Nebraska Equal Opportunity Commission, and the federal Equal Employment Opportunity Commission on December 29, 2014. That matter was administratively closed and a right to sue letter issued on December 17, 2015. (A true and correct copy of the EEOC Right to Sue letter dated December 17, 2015, is attached as Exhibit B and incorporated by this reference.)

## VENUE & JURISDICTION

15.    This matter arises under federal and state law. This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331 based on Ms. Carter's federal claims in this Complaint. This Court has supplemental jurisdiction of the Nebraska state law claims pursuant to 28 U.S.C.§ 1367.

16.    Venue is proper in this district pursuant to 28 U.S.C § 1391(b)(2), because the acts complained of here were orchestrated from, planned in and conducted in this District.

## PARTIES

17.     Ms. Carter is a citizen and resident of Omaha, NE.  She is a Caucasian female, who has a disability.  She was employed at Metropolitan Community College's South Omaha campus.

18.     Metro is a political subdivision of the State of Nebraska and body corporate and politic.

## COUNT I
## SEX DISCRIMINATION AGAINST METRO—
## HOSTILE WORK ENVIRONMENT
## (42 U.S.C. § 2000e-2; Neb. Rev. Stat. § 48-1101 *et seq.*)

19.     Ms. Carter incorporates by reference paragraphs 1-18, inclusive, as if fully set forth.

20.     Since 2009, Ms. Carter has been discriminated against on the basis of sex, in particular due to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as Amended, and Section 48-1104 of the Nebraska Fair Employment Practice Act; and on the basis of retaliation in violation of Section 48-1114(3) of the Nebraska Fair Employment Practice Act.

21.     According to Title VII of the Civil Rights Act of 1964,

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, … [or] sex;
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, … [or] sex.

42 U.S.C. § 2000e-2.

22.     Similarly, Nebraska's FEPA provides:

It shall be an unlawful employment practice for an employer:

5

> (1) To fail or refuse to hire, to discharge, or to harass any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's … [or] sex.

Neb. Rev. Stat. § 48-1104(1).

23.     Title VII also prohibits an employer from subjecting its employees to a hostile work environment "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see, e.g., Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n. 10 (2002) (racial harassment); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (sexual harassment). To establish a hostile work environment claim, Plaintiff must show

> (1)     she was a member of a protected class, (2) she was subjected to unwelcome harassment, (3) the harassment was based on a protected characteristic under Title VII, (4) the harassment affected a term, condition or privilege of employment, and (5) employer liability.

*See generally Willis v. Henderson,* 262 F.3d 801, 808 (8th Cir. 2001).

24.     Federal harassment standards are demanding. *See McCurdy v. Ark. State Police*, 375 F.3d 762, 768 (8th Cir. 2004). The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[S]tandards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' " Id. (citation omitted).  *Al-Zubaidy v. TEK Industries, Inc.*, 406 F.3d 1030 (8th Cir. 2005)

25.     This case, which includes allegations of daily, constant, and repetitive sexual innuendo as well as explicit, vulgar language originating with the Dean of the Department, is not about "general civility."  Rather, this case is one in which Ms. Carter regularly was subjected to the toxic, offensive and coarse language and antics that prevent work from being done and poison the work atmosphere.

WHEREFORE, Ms. Carter requests judgment ordering an award of damages pursuant to 42 U.S.C. § 2000e-2 and Neb. Rev. Stat. § 48-1119(4) based on Metro's discriminatory harassment by Dean Ocander and Metro.

**COUNT II**
**METRO VIOLATED THE**
**AMERICANS WITH DISABILITIES ACT & NFEPA**
**BY DISCRIMINATING AGAINST MS. CARTER BASED ON DISABILITY**
Americans With Disabilities Act Of 1990
42 U.S.C. § 12101 et seq.
Neb. Rev. Stat. § 48-1104

26.     Ms. Carter incorporates by reference paragraphs 1-25, as if fully set forth.

27.     Under the ADA, an individual is "disabled" if she:

has a physical or mental impairment that substantially limits one or more of her major life activities; (2) has a record of such an impairment; or (3) is regarded by her employer as having such an impairment.

42 U.S.C. § 12102(1).

28.     A disabled individual must demonstrate impairment that "substantially limits" one or more major life activities.  42 U.S.C. § 12102(2).  An individual is "substantially limited" if she or she is:

Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner, or duration under which [he or she] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).  "Major life activities" include, but are not limited to,

caring for oneself, performing manual tasks, * * * communicating, and working.

42 U.S.C.A. § 12102(2)(A).

29.     In determining whether an individual's impairment substantially limits a major life activity, courts should consider the following factors:

The nature and severity of the impairment, (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

30.     Metro's demeaning, disrespectful and harassing conduct, which was a regular component of Ms. Carter's day-to-day work environment, which was known to and accepted by Metro human resources, has been and continues to be in direct contravention of 42 U.S.C. § 12101 et seq.; Neb. Rev. Stat. § 48-1101 *et seq* 42 U.S.C. § 2000e-2 and §48-1104.

31.     Ms. Carter suffers from a disability known as Epstein-Barre syndrome.

32.     Ms. Carter informed Metro of her disability, and Dean Stacey Ocander replied that this disability was "ridiculous."

33.     There is no legitimate basis justifying Metro's harsh, oppressive and discriminatory treatment of Ms. Carter simply because she suffers from a medically diagnosed disability.

WHEREFORE, Ms. Carter requests judgment ordering an award of damages pursuant to 42 U.S.C. § 12102(1). and Neb. Rev. Stat. § 48-1119(4) based on Metro's discriminatory terms and conditions of employment.

**COUNT III**
**RETALIATION BY METRO –**
**IN VIOLATION OF TITLE VII & NEBRASKA FEPA**
**(42 U.S.C. § 2000e-2; Neb. Rev. Stat. § 48-1101 *et seq.*)**

34.     Ms. Carter incorporates by reference paragraphs 1-33, inclusive, as if fully set forth.

35.     Metro's failure to provide Ms. Carter with training opportunities, both within Metro and through third parties, as part of her employment has been and continues to be in direct contravention of 2 U.S.C. § 2000e-2 and §48-1104.

36.      Title VII prohibits an employer from retaliating against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  *Strom v. Holiday Cos.,* 789 F. Supp.2d 1060, 1086 (N.D. Ia. 2011).  A prima facie case of retaliation requires Plaintiff to show (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action.  *Weger v. City of Ladue*, 500 F.3d 710, 726 (8th Cir.2007).  Ms.

37.     Ms. Carter took her complaints about unequal treatment to the Metro HR Department.  She only went one time, however, because the HR Department did not keep her original complaints about Dean Ocander confidential.  Instead, Ms. Carter's complaints were immediately relayed to Dean Ocander and she took steps against Ms. Carter.  Those steps included the termination that ended Ms. Carter's employment with Metro.

WHEREFORE, Ms. Carter requests judgment ordering an award of damages pursuant to 42 U.S.C. § 2000e-2 and Neb. Rev. Stat. § 48-1119(4) based on Metro's retaliation against Ms. Carter, resulting in her discharge.

## CONCLUSION

Ms. Carter requests judgment on her behalf based on the sexually poisoned atmosphere created and fostered by Dean Ocander, and the retaliation she suffered for complaining about Dean Ocander's treatment.

## REQUEST FOR RELIEF

WHEREFORE, Ms. Carter requests judgment in his favor and awarding:

1. Damages for Ms. Carter's lost and future wages due to her unjustified and discriminatory discharge;

2. College tuition benefits for two children, her husband and herself, due to her unjustified and discriminatory discharge;

3. Damages for Ms. Carter's emotional pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life;

4. Damages for Ms. Carter's out-of-pocket expenses for mental health treatment;

5. Punitive damages for Metro's knowing violation of federal discrimination laws;

6. Costs and attorney fees; as allowed by law, and

7. Further and further relief as the Court deems appropriate.

**PLAINTIFF MAKES DEMAND FOR TRIAL BY JURY.**

BRANDI CARTER, Plaintiff,

By:   /s/ Terry A. White
Terry A. White #18282
**CARLSON & BURNETT, LLC**
17525 Arbor Street
Omaha, NE 68130
Direct:  (402) 682-8006
Main:  (402) 934-5500
terry@carlsonburnett.com
*Attorneys for Plaintiff*



EXHIBIT A

16 Pages

HUMAN RESOURCES
Index No. VI-24

PROCEDURES MEMORANDUM

TO:          MCC Staff

FROM:        Office of the President

SUBJECT:     Employee Discipline Procedural Suggestions and General Work Expectations

DATE:        December 18, 2012

PURPOSE:     To suggest to supervisors procedures for addressing employee discipline and
             performance deficiencies and to advise employees of general work expectations.

SCOPE:       The procedural suggestions described herein may be applied to full-time and part-
             time non-exempt employees, full-time exempt employees, full-time academic
             advisors, faculty, and counselors.

As used in this Procedures Memorandum, "exempt" employees are those employees of the
College who are exempt from (and thus not entitled to) payment of overtime compensation under
the provisions of the federal Fair Labor Standards Act; all other employees of the College are
"non-exempt" employees.

These suggestions may not be applied where such application would conflict with procedures
prescribed by statute, by applicable collective bargaining agreement(s), or by other policies of
the College Board of Governors.

The procedural suggestions stated herein are intended for use solely by supervisory employees in
performing supervisory functions. The College reserves the right to deviate from the procedural
suggestions described herein at any time with or without notice. These procedural suggestions do
not form any part of any contract of employment between any employee(s) and the College.

Table of Contents

SECTION I: Employee Discipline Procedural Suggestions

        Responsibilities
        General Principles
        Notification of General Work Expectations and Standards of Conduct
        Non-Disciplinary Actions
        Disciplinary Actions
            Special Rules Apply if the Reason for Disciplinary Action is a "Stigmatizing" Reason
        Miscellaneous
        Special Notice Under the Drug Free Schools & Communities Act Amendments of 1989

1

SECTION II: General Work Expectations

> General Expectations
> Hours of Work and Attendance
> Property
> Personal Actions and Appearance
> Outside Activities and Employment

SECTION I

Employee Discipline Procedural Suggestions

1. Responsibilities

   A. Supervisors – Supervisors should be aware of employee misconduct and/or performance deficiencies within the supervisor's respective department or area. It is the responsibility of the department supervisor and the next higher supervisor to initiate non-disciplinary action and disciplinary action when it becomes necessary.

   B. Associate Vice President of Human Resources – The Associate Vice President of Human Resources will serve in an advisory role to supervisors contemplating non-disciplinary actions or disciplinary actions as described herein. For the protection of the interests of the supervisor and the College, no supervisor should take or initiate such actions without prior consultation with the Associate Vice President of Human Resources.

2. General Principles

   The College believes discipline is most constructively utilized when intended to be corrective in nature rather than punitive.

   As such, discipline is normally most constructive when applied in a progressive manner. This enables employees to have the opportunity to correct problems before more serious actions are taken. The object of progressive discipline is to improve employee performance and conduct and thus facilitate improved College operations. The application of progressive discipline is, however, dependent upon the seriousness of the problem as determined by supervisors under the circumstances of each case. Some problems may warrant more severe supervisory actions in the first instance. The College fully reserves the right to impose such discipline as may be deemed appropriate by supervisors under the circumstances of each case.

   Misconduct and failure to meet performance standards require action by supervisors. Examples of misconduct include, but are not limited to, negligence, conviction of a crime, conduct unbecoming a College employee, dishonesty, failure or refusal to follow lawful instructions or orders of a supervisor or other authorized College employee, insubordination or other failure to meet General Work Expectations outlined in Section II of this Procedures Memorandum. Failure to meet performance standards may range from inefficiency to

2

inadequacy to incompetence. Performance standards are established, among other methods, by day-to-day instructions of supervisors.

The two-year probationary period prescribed by state law for full-time faculty provides that faculty may be terminated during such period without cause. College policy reflects state law in that regard. State law prescribes certain of the procedures to be followed in terminating a non-probationary faculty member for just cause. College policy conforms to such procedures.

Exempt non-faculty employees, academic advisors, and counselors receive annual appointments. During the terms of such annual appointments, these employees may be terminated for just cause, provided that such employees newly employed are subject to a two-year probationary period. During the two-year probationary period, the College may terminate such appointments without cause at any time. In addition, renewal of employment upon expiration of such annual appointments during or after the two-year probationary period is at the continuing discretion of the College.

Non-exempt employees (both regular and non-regular) are employed, during the original and any extension of the orientation period applicable to non-exempt employees, and thereafter, at the continuing discretion of the College President. The original and any extended orientation period should be used to screen out newly hired non-exempt employees who are not performing as expected. Satisfactory completion of the original and any extended orientation period does not, however, constitute any contract or assurance of continued employment.

3. Notification of General Work Expectations and Standards of Conduct

Notification to employees of work expectations and accepted standards of conduct is accomplished through such materials as procedures memorandums, bulletin board postings, written or oral directions, e-mail, employee handbooks, etc. Notification also occurs through the orientation and performance evaluation process, training, day-to-day supervision and supervisory instructions, and prior non-disciplinary action(s) and disciplinary action(s). In addition, General Work Expectations are outlined in Section II of this Procedures Memorandum. Employees are expected to familiarize themselves with the above referenced materials and information.

4. Non-Disciplinary Actions

Non-disciplinary actions are actions that may be taken when performance or conduct problems are first observed and before those problems reach a level that is judged by supervisor(s) to require disciplinary actions. However, circumstances may cause the supervisor to determine, in the exercise of his/her judgment, that immediate disciplinary action is warranted without prior non-disciplinary action.

The use of non-disciplinary actions in appropriate cases may resolve problems and eliminate the need for later disciplinary actions. If later disciplinary action(s) is required, prior non-disciplinary action(s) will serve as evidence of prior notification and of supervisory efforts to

3

correct the problem. Some non-disciplinary actions which may be used for constructive corrective purposes are:

A. Employee Consultation – Employee consultation by supervisors may be conducted when there is a perceived need to clarify job performance expectations or to correct conduct infractions or performance deficiencies judged by the supervisor to be minor. At such consultations, supervisors can explain to the employee the problem area(s), indicate what corrective steps need to be taken, and answer questions relating to the problem area(s). Such consultations with the employee should be conducted in private. Supervisory staff should document any such consultation by preparing and retaining a typed note or memorandum describing the subject matter(s) discussed and the date the consultation took place.

B. Clarification of Expectations – A written clarification of conduct or of performance expectations may be given by the supervisor to an employee when the supervisor believes there is a need to more formally clarify such expectations or to attempt to correct minor infractions. The clarification normally would be prepared after an employee consultation that has not resolved the problem or to confirm the consultation. However, a clarification of expectations may be given without a prior employee consultation if warranted in the supervisor's judgment. A written clarification of expectations may also be useful if the instructions are so detailed that they need to be written down.

A clarification of expectations ordinarily should state the problem area(s), the action necessary by the employee to solve the problem(s), and include references to any previous employee consultations or clarifications of expectations relating to the same, similar or prior performance or conduct problem(s), if applicable. Clarification of expectations should be documented in the form of a memorandum, discussed with the employee, and signed by the supervisor and the employee. If the employee refuses to sign, the supervisor should so note on the memorandum. The employee should be given a copy of the clarification. A copy of the clarification of expectations will remain in the employee's personnel file permanently.

C. Reassignment or Transfer – Reassignment or transfer (not involving reduction in grade or loss of pay) can sometimes be an effective way of resolving a job performance, conduct, personality conflict or other problem which does not warrant immediate disciplinary action.

By requesting the assistance of the Associate Vice President of Human Resources, supervisors may arrange for or seek lateral reassignment or transfer of an employee if, in the judgment of the supervisor, the employee is not functioning effectively in his/her present assignment or position due to job performance, conduct, personality conflict or other problems. This option is, of course, limited by the then-availability of lateral vacant positions. A written statement of the reasons for the reassignment or transfer may be given to the employee by the supervisor and a copy will be placed in the employee's personnel file permanently.

4

D.  Referral to Employee Assistance Program or Other Agencies – When deemed appropriate, supervisory officials may refer employees to the Employee Assistance Program or to other social service agencies or counselors.

The above outlined non-disciplinary actions need not be applied in sequence nor in any particular order. Further, non-disciplinary actions need not precede imposition of any of the disciplinary actions described in the following paragraphs. In each case, the supervisor should take or initiate such non-disciplinary or disciplinary action(s) which, in the supervisor's judgment, is in the best interest of the College, giving due regard to the time and money previously expended by the College in recruiting and training the employee, and whether, in the supervisor's judgment, the employee can become a fully satisfactory employee if action other than discharge is taken.

No appeals of non-disciplinary actions are permitted.

5.  Disciplinary Actions

It is suggested that supervisors attempt to impose disciplinary action to which, in the supervisor's judgment, the employee is most likely to satisfactorily respond. Corrective discipline implies that the disciplinary action imposed by the supervisor is intended to result in correction of employee performance or conduct.

However, and as previously noted, in each case the supervisor should take or initiate such non-disciplinary or disciplinary action(s) which, in the supervisor's judgment, is in the best interest of the College, giving due regard to the time and money previously expended by the College in recruiting and training the employee, and whether, in the supervisor's judgment, that employee can become a fully satisfactory employee if action other than discharge is taken.

Special Rules Apply if the Reason for Disciplinary Action is a "Stigmatizing" Reason. In every situation, the supervisor must consider early on in the disciplinary process whether the reason for taking disciplinary action is a "stigmatizing" reason (such as an allegation or suspicion of dishonesty, sexual or fiscal misconduct, criminal behavior, immorality, racism, child or student abuse, an act of moral turpitude, or the like). This is because the courts distinguish "stigmatizing" reasons from the more routine reasons for employee discipline (such as unsatisfactory job performance, unsatisfactory attendance, failure or refusal to follow instructions, and so forth). Specific legal considerations and restrictions apply if the reason for disciplinary action can do serious harm to an employee's reputation (that is, a "stigmatizing" reason), and the courts often require additional procedures and safeguards where the reason is a stigmatizing reason. Whenever the reason for discipline possibly involves a stigmatizing reason, the supervisor should consult with both the Associate Vice President of Human Resources and the College's General Counsel before taking any disciplinary action. It is also critical that the supervisor not discuss the matter with anyone other than the employee, the Associate Vice President of Human Resources, the College's General Counsel, President or Executive Vice-President.

5

Once the supervisor, in the exercise of his/her judgment, has determined that disciplinary action is warranted, the matter may be best handled by following this sequence of disciplinary actions: oral reprimand, written reprimand, imposed probation, imposed downgrade (non-exempt employees only), suspension and discharge.

However, supervisors and the College are not bound to follow such sequence when unacceptable performance or misconduct are, in the discretion and judgment of supervisors, considered to be so severe or cumulative as to warrant immediate suspension or discharge. Similarly, supervisors may elect to give more than one reprimand or to seek consecutive suspensions of increasing severity for repeated, similar, or cumulative infractions or performance deficiencies. Additionally, more than one disciplinary action, more than one non-disciplinary action, or any combination of disciplinary and non-disciplinary actions, may be imposed at the same time, such as suspension followed by imposed probation on return to work. Documentation of all disciplinary actions will be maintained in the affected employee's personnel file permanently.

Disciplinary actions and procedures are:

A. Oral Reprimand – An oral reprimand may be appropriate for non-repetitive job performance problems or conduct infraction(s) judged by the supervisor to be of such a nature as not to require more severe disciplinary action. The supervisor explains the problem or infraction(s) to the employee and requests the employee's cooperation in correcting his/her behavior. The supervisor should make and retain a note or memorandum of the reprimand for future reference.

B. Written Reprimand – A written reprimand may be given for cumulative or repeated job performance problem(s) or conduct infraction(s), where deemed appropriate in the supervisor's judgment, or for a single occurrence where the supervisor judges the occurrence to require more substantial disciplinary action than an oral reprimand.

Supervisory staff should prepare a written reprimand in memorandum or letter form. The written reprimand should explain the infraction(s) or problem(s) to the employee and indicate to the employee what specific steps the employee should take to remedy the situation. The written reprimand should document or list the employee's past offenses or problems, if any, and recite that it is a written reprimand. The employee should also be informed in writing that he/she may file with the supervisor a written response to the reprimand for inclusion in the personnel file along with the written reprimand.

The supervisor should sign the written reprimand and receipt should be evidenced by the employee's signature. If the employee refuses to sign the reprimand, the supervisor should note such refusal on the memorandum or letter. Copies, with all signatures, should be given to the employee and to the Associate Vice President of Human Resources for permanent placement in the employee's official College personnel file.

6

C. Imposed Probation – An imposed probation of three to six months duration, or longer, may be given for an occurrence or for job performance or misconduct problems (or accumulations or repetitions of such occurrences or problems) if the supervisor's judgment is that such problems warrant(s) further or more substantial disciplinary action than a written reprimand.

Imposed probation will require prior review and approval of the Associate Vice President of Human Resources. If an employee is placed on imposed probation, supervisory staff should prepare a memorandum to the employee outlining the reason for the imposed probation, the specific actions(s) necessary to remedy the problem(s), and the length of the probationary period. The signed memorandum should be given to the employee who will be requested to acknowledge receipt in writing, with a copy directed to the Associate Vice President of Human Resources for inclusion in the employee's personnel file. If the employee refuses to sign the imposed probation, the supervisor should note such refusal on the memorandum. The copy of the imposed probation memorandum will remain in the employee's personnel file permanently.

After completion of an imposed probationary period that is not of permanent duration, if not before, a written performance review will be conducted by the supervisor to review the employee's job performance and/or conduct during the probationary period. A copy of the performance review will be given to the employee and the original will be sent to the Human Resources office. The review must indicate the supervisor's judgment regarding the necessity for any further disciplinary action or indicate resolution of the problem(s).

If deemed appropriate, the period of imposed probation may be extended by the supervisor, with the approval of the Associate Vice President of Human Resources. Procedurally, extension of an imposed probation will be handled as if it were a new imposed probation.

D. Imposed Downgrade to Position in Lower Job Group (Pay Grade) for Regular Non-Exempt Employees (not applicable to exempt positions) – Where deemed practical and in the best interest of the College, a supervisor may, after obtaining the approvals described below, impose on a non-exempt employee a reduction in pay grade/classification or a demotion to a position having a lower pay grade as a disciplinary action. Supervisors must recognize, however, that this may be done only in situations where the College has an employment opening available for a person of the pay grade and classification to which the employee is to be demoted or reduced, and only where the employee meets the qualifications for such an available opening. The Associate Vice President of Human Resources will assist in identifying available openings. Where such disciplinary action would require reassignment of the employee to a different supervisor's area of responsibility, prior approval must be obtained from (1) the supervisor, Dean and Vice President having supervisory authority over the area to which the employee is to be reassigned, (2) the Dean and Vice President having supervisory authority over the area from which the employee is to be reassigned, and (3) the Executive Vice President.

7

Reduction in pay grade/classification or demotion of a non-exempt employee, which has been approved as specified above, shall be final and no appeal is allowed therefrom.

E. Suspension – A supervisor may, with the advice of the College's General Counsel and the approval of the Executive Vice President, suspend an employee where, in the exercise of his/her judgment, the supervisor determines there are serious (or repeated minor or cumulative) job performance problems or conduct infractions, or where suspension is deemed appropriate pending further investigation. The length of suspension should be determined by the seriousness of the matter and the employee's past work behavior. Normally, suspensions will be from one to three days' duration, but may be longer.

1) Suspension Without Pay Procedures for Exempt Employees – Suspension without pay of an exempt employee is not to be imposed unless, prior thereto, the employee has been provided the following "due process" procedures:

   (a) Written notice of the cause or causes for disciplinary action;

   (b) An explanation of the evidence against the employee, including the names of person(s) making allegations about the matter and witnesses, in sufficient detail to enable the employee to meaningfully respond to the charge(s) and present evidence relating to them; and

   (c) A meaningful opportunity to respond to the allegations/charges against the employee, to explain his or her side of the story, and to present evidence in support of his or her defense.

If the suspending supervisor, after the foregoing "due process" procedures have been completed, determines that just cause exists and suspension without pay is warranted, the employee shall be notified in writing of the decision. An employee so notified shall have the right to request a hearing with the President.

Appeals by Exempt Employees of Suspensions Without Pay – If the employee wishes to request a hearing before the President, the employee must deliver to the College President or to the College's General Counsel, within five (5) calendar days after the date the employee is notified in writing of the suspension decision, a written request for a hearing before the President. For this purpose, if the last calendar day for delivering the written request for a hearing falls on a Saturday, Sunday, College holiday, or day that the College is closed due to inclement weather, the written request for a hearing shall be considered to have been timely delivered by the employee if it is delivered on the next ensuing business day on which the College Business Office is open for business.

At the hearing before the President, the College General Counsel shall present evidence in support of the suspension and the employee may present evidence related thereto. The President shall render a written decision, based on the evidence produced at the hearing, to sustain, reverse, or modify the suspension decision, and shall

8

provide copies of the decision to the employee and to the College's General Counsel. The decision of the President shall be final.

The President's record of the hearing, and any audio or video recording or transcription therefrom, shall be the official record of the hearing.

2) Suspension Without Pay Procedures for Non-Exempt Employees – A supervisor may, with the advice of the College's General Counsel and approval of the Executive Vice President, suspend a non-exempt employee without pay if such suspension is deemed appropriate by the suspending official based upon the evidence adduced by investigation and considered during such procedures.

The length of suspension should be determined by the seriousness of the matter and the employee's past work behavior. Normally, suspensions will be of one to three days duration, but may be longer. A written statement of the reasons for, and the length of, the suspension will be given or made available to the employee by not later than the end of the next College business day following the imposition of the suspension. The statement should explain to the employee the problem area(s) and indicate the action(s) necessary to resolve the problem(s). A copy of the statement will be given to the employee and also placed in his/her official personnel file. The employee should be asked to acknowledge receipt of the statement by signing a copy of the statement. If the employee refuses to do so, the supervisor should note such refusal on the personnel file copy of the statement. Suspension statements will remain in the personnel file permanently.

a) Appeals by Non-Exempt Employees of Suspensions Without Pay – Non-exempt employees (regular and non-regular) serve at the continuing discretion of the College President. In the case of such employees, a suspension without pay imposed in accordance with the procedures set forth above shall be final, and no appeal shall be allowed therefrom.

3) Suspension With Pay Procedure – Suspension imposed as a disciplinary action will normally be without pay. However, suspension of an employee with pay is authorized if the purpose of the suspension is to conduct an investigation of the facts to determine appropriate action, or if other circumstances warrant. Suspension with pay may be imposed with the prior approval of the Executive Vice President, but may be imposed without the "due process" procedures required prior to a suspension of an exempt employee without pay, and without any right of appeal. Suspension with pay may be followed by suspension without pay or discharge only after following any "due process" procedures specified in this Procedures Memorandum as being applicable to such actions, however.

F. Discharge of Exempt Employees

1) Nonrenewal of Appointment or Reductions in Force

9

Non-renewal of an appointment of a professional staff employee (including probationary faculty, but excluding non-probationary faculty), upon expiration of an appointment, is not considered a "discharge" or "dismissal" under this PM. "Just cause" is not required for such non-renewals of appointments. Likewise, reductions in force are not considered "discharges" or "dismissals" under this PM, but may be covered under other procedures or policies of the College.

2) "Just Cause" Dismissal

a) The term "just cause" means incompetence, neglect of duty, unprofessional conduct, insubordination, immorality, physical or mental incapacity, or other conduct that interferes substantially with continued performance of duties. Incompetence includes, but is not limited to, demonstrated deficiencies or shortcomings in knowledge of subject matter or teaching or administrative skills.

"Just cause" is required to dismiss from employment:

(1) Exempt employees (other than non-probationary full time faculty) after completion of the applicable two-year probationary period, except where separation from employment is being effected through non-renewal of an appointment; and

(2) Non-probationary full time faculty employees, either during or at the end of a term of appointment.

b) Where "just cause" is not required to terminate the employment of an exempt employee (see F.1 and F.2, above), the President shall make the final determination regarding termination. No appeal shall be allowed to the Board of Governors.

c) Where "just cause" is required to terminate the employment of an exempt employee (see F.2 above), the employee may not be terminated until after he/she has been provided with each of the following "due process" procedures:

(1) Written notice of the cause or causes for disciplinary action;

(2) An explanation of the evidence against the employee, including the names of person(s) making allegations about the matter and witnesses, in sufficient detail to enable the employee to meaningfully respond to the charge(s) and present evidence relating to them; and

(3) A meaningful opportunity to respond to the allegations/charges against the employee, to explain his or her side of the story, and to present evidence in support of his or her defense.

10

If the President or his or her designee, after the foregoing "due process" procedures have been completed, determines that just cause exists and termination is warranted, the employee shall be notified in writing of the termination decision. (If the matter involves a contract non-reappointment, a contract termination that is not to be effective until the beginning of the ensuing contract year, or a contract amendment that is not to be effective until the beginning of the ensuing contract year, rather than a termination of employment during the term of the current contract or appointment, then the provisions of Neb.Rev.Stat. § 85-1528 shall apply.) An employee so notified shall have the right to request a hearing before the Board of Governors.

If the employee wishes to request a hearing before the Board of Governors, the employee must deliver to the College President or to the College's General Counsel, within five (5) calendar days after the date the employee is notified in writing of the termination decision, a written request for a hearing before the Board of Governors. For this purpose, if the last calendar day for delivering the written request for a hearing falls on a Saturday, Sunday, College holiday, or day that the College is closed due to inclement weather, the written request for a hearing shall be considered to have been timely delivered by the employee if it is delivered on the next ensuing business day on which the College Business Office is open for business.

Upon receipt of a timely written request for a hearing before the Board of Governors, the Board Chair shall set a hearing date and time. The President or College General Counsel shall provide notice of the hearing date and time to the employee. The hearing shall be held before not less than a quorum of the Board, and the hearing shall be held as soon as a quorum of the Board practicably may be convened for such purpose. In no event will the hearing be held less than five (5) calendar days after the date of delivery of the written request for hearing by the employee.

Pursuant to Neb.Rev.Stat. § 85-1528, if the matter involves a contract non-reappointment, contract termination that is not to be effective until the beginning of the ensuing contract year, or contract amendment that is not to be effective until the beginning of the ensuing contract year, rather than a termination of employment during the term of a current contract or appointment, the hearing shall be held within ten (10) days after receipt of the employee's timely written request for a hearing.

At the hearing before the Board, the College General Counsel (or another individual designated by the President) shall present evidence in support of the termination (or amendment) and the employee may present evidence related thereto. The Board shall render a written decision, based on the evidence produced at the hearing, to sustain, reverse, or modify the termination decision (or to amend or terminate the employee's contract for the ensuing year, as the case

11

may be), and shall provide copies of the decision to the employee and to the College's General Counsel. The decision of the Board shall be final.

The board's record of the hearing, and any audio or video recording or transcription therefrom, shall be the official record of the hearing.

G. Discharge of Non-Exempt Employees

1) Regular non-exempt employees – Termination of a non-exempt employee during his/her applicable orientation or probationary period, and any extension thereof, and termination of a non-exempt employee due to reduction in force or elimination of positions, shall not be considered a "discharge" or "dismissal" under this PM.

The appropriate Vice President or the Executive Vice President may, with the approval of the College President, discharge a non-exempt employee when, in the exercise of the Vice President's or Executive Vice President's discretion and judgment, the best interests of the College require discharge.

The supervisor will provide or mail to the employee a written statement confirming the discharge and the effective date of discharge within 72 hours of any verbal discharge notice. Copies of the discharge notice will be provided to Human Resources and the higher level supervisors.

A non-exempt employee who has satisfactorily completed his/her applicable orientation or probationary period, and any extension of such period, will be given two weeks (fourteen calendar days) notice of termination or, at the option of the College President, two weeks (14 calendar days) pay in lieu of such notice, unless the discharge is based upon unprofessional conduct, misappropriation or misuse of College funds or property, insubordination, or immorality.

Termination of a non-exempt employee, concurred in by the College President, shall be final and no appeal or grievance will be allowed or considered which arises therefrom.

The College President, or his or her designee, may, at his/her discretion, suspend (with or without pay) or discharge any regular non-exempt employee without any recommendation from a Dean or Vice President, or the Executive Vice President, and without right of appeal.

2) Non-Regular Non-Exempt Employees – Non-regular non-exempt employees may be terminated or otherwise disciplined by the President without notice, pay in lieu of notice, or cause, at the continuing discretion of the President. No appeal or grievance will be allowed or considered which arises therefrom.

Nothing contained in this PM shall be interpreted to mean that either regular or non-regular non-exempt employees serve other than at the continuing discretion of the College President.

12

6. Miscellaneous

   A. <u>Investigative Considerations</u> – Supervisory staff should thoroughly investigate all
      pertinent aspects of a case before imposing or initiating non-disciplinary action or
      disciplinary action. In order to determine the facts of the case, the supervisor should
      interview the employee and any witnesses deemed by the supervisor to possess relevant
      information. Investigation should include obtaining and retaining any physical or written
      evidence and hearing any explanation the employee may choose to offer. The supervisor
      should consider visiting the incident site if such a visit would be helpful. The supervisor
      should cross-check stories if conflicts or inconsistencies exist. The scope of the
      investigation should be consistent with the circumstances of the case and the nature of the
      action contemplated.

   B. <u>Performance Reviews</u> – The completion of performance review forms during periods
      when employees are experiencing job performance problems or engaging in misconduct
      is extremely important. Performance evaluations are normally completed annually.
      However, they may be conducted at any time during the process of non-disciplinary
      actions or disciplinary actions. They serve as important documentation of efforts to
      correct employee deficiencies. It is extremely important that such reviews accurately and
      fully reflect performance and/or conduct deficiencies and recommend improvement
      actions.

   C. <u>Confidentiality</u> – A supervisor should discuss disciplinary investigations and matters only
      with those individuals who have a need to know or who can provide pertinent facts.
      Caution should be used to protect reputations.

   D. <u>Relationship to Grievance Procedures</u> – Except as may be provided otherwise in a then
      applicable collective bargaining agreement, the appeal rights (if any) specified herein
      shall be the exclusive review procedures and appeal rights allowed respecting the non-
      disciplinary actions and disciplinary actions described herein. Except as specifically
      permitted herein, no grievance procedure of the College may be utilized to obtain any
      review of, or to appeal from, any non-disciplinary action or disciplinary action imposed
      under this Procedure Memorandum.

7. <u>Special Notice Under The Drug-Free Schools And Communities Act Amendments Of 1989</u>:
   See PM VI-30, <u>Drug Free Workplace Requirements</u> and PM X-5, <u>Drug Prevention Program
   Under the Drug Free Schools and Communities Act as Amended</u>.

SECTION II
<u>General Work Expectations</u>

The following is an illustrative (but not exhaustive) list of expectations with which every College
employee must comply. College employees must satisfy such expectations regarding personal
conduct. Failure to do so may result in disciplinary action, if deemed appropriate by the College.

13

1. General Expectations

    A. Employees are to be attentive to their work responsibilities and are to perform those responsibilities competently and efficiently while maintaining harmonious and cooperative relations with other employees.

    B. Loafing, loitering, sleeping, visiting and engaging in unauthorized personal business (by telephone or otherwise) while on duty are not permitted.

    C. Employees shall comply with all Board of Governors and College policies and procedures.

    D. Employees shall refrain from engaging in any unlawful discrimination because of or based upon race, color, religion, sex, sexual orientation, age, national origin, marital status, or disability. Harassment in any form, including but not limited to harassment based on or because of any of the classifications listed in the preceding sentence, is likewise prohibited.

    E. Insubordination, disobedience and failure or refusal to follow written or oral instructions from supervisory authority is prohibited. However, supervisory directives which would result in blatant infractions of health and safety regulations, or supervisory directives to engage in illegal actions, are not to be carried out and are to be immediately reported to a higher authority within the College.

    F. Disclosure of confidential information or records, other than to an individual entitled to receive the information or record as part of his or her official duties for the College or to an individual entitled by law to receive such information or record, is prohibited. Providing information or making any statement to any person, knowing the information or statement is false, is similarly prohibited. Unethical use of confidential information or intentional falsification of any record is likewise prohibited.

    G. Employees must observe all safety and health rules, including rules requiring use of protective equipment and clothing, and laws, rules and regulations governing operation of equipment, machinery, and vehicles. Employees must immediately report accidents or injuries that occur during working hours or while on College business.

2. Hours of Work and Attendance

    A. Unless otherwise directed by supervisory authority, employees must comply with their established work day starting and quitting times and are only to take authorized breaks and lunch periods. Employees must work the full number of hours for which they are paid, less any official paid leave time or absence which has been approved.

    B. Sick leave must be used properly. Excessive use or abuse of sick leave is unacceptable. Absences will be excused only with proper authorization. Absences without notification and prior approval are prohibited. If an employee is unexpectedly absent, supervisory

14

authority must be notified in person or by telephone at the earliest possible time, and in no event later than one-half hour after the employee was to have commenced work. Such notice to the supervisor must be given each day that the illness continues unless excused. No employee may leave work without supervisory approval, except in a bona fide emergency, in which event the employee personally shall notify the supervisor immediately at the first opportunity.

3. Property

A. Unauthorized entry upon, use, abuse, misuse, theft, conversion, possession or waste of College-owned property, property at College work sites, or property of another on a College campus or other facility under the control of or being used by the College, is prohibited.

B. Improper or unlawful use of College vehicles, equipment, facilities or materials is prohibited. Waste, diversion, conversion, theft, or unauthorized personal use of College supplies or telephone, reproduction, or other equipment is prohibited.

C. Installation of any computer software on any College computer without written approval of the supervisor is prohibited.

4. Personal Actions and Appearance

A. Employees are expected to remain calm even when provoked or in stressful situations. Employees will not threaten or attempt to do bodily or other injury, engage in physical violence, intentionally inflict mental anguish, or engage in any other physically or verbally abusive action directed toward students, College employees, representatives of other organizations, or the general public.

B. Unauthorized or unlawful possession, use, trading, selling, or delivery of alcoholic beverages, controlled substances, or narcotics during the employee's work hours or while on College property, or while engaged in College business, is prohibited. This includes, but is not limited to, the unlawful possession, use or distribution of illicit drugs or alcohol on College property or as part of or in the course of any College activity.

C. Employees shall not report to work in: (a) a physical or mental condition which is unsafe to the employee, others, or physical property; (b) a physical or mental condition which renders one substantially incapable of effectively performing job responsibilities; or (c) a physical or mental condition which creates an unfavorable public image. Such conditions include, but are not limited to, those caused by disabling physical illness or by being under the influence of alcohol, narcotics, or other chemical substances, or by abuse of alcohol, narcotics, or other chemical substance.

D. Unauthorized solicitation of funds, donations or services, unauthorized sale of commercial products, and unauthorized political solicitation, while on College business or premises, are prohibited. Unauthorized distribution of printed, published, or other

15

mass-produced material is not permitted during the working time of either the distributor or distributee, or in College work areas.

E. Unauthorized possession, lending, borrowing, duplication, or careless or improper use, or failure to report the loss of College keys or other assigned items, are prohibited. Return of all College property upon termination is required.

F. Employees must refrain from using abusive or foul language.

5. Outside Activities and Employment

Public conduct that materially interferes with an employee's ability to effectively perform assigned duties, or which has a detrimental effect on the College's image or operations, is prohibited. This includes, but is not limited to, commission of a felony or other crime of dishonesty or moral turpitude, or willful failure to comply with court-ordered obligations.

Adopted 9/1/90 (Professional Employee Discipline Procedural Suggestions and General Work Expectations and PM VII-22 Classified Employee Discipline Procedural Suggestions and General Work Expectations) Revised and Combined 1/22/02; Revised 11/11/03; 6/21/07; 1/17/08; 2/27/08; 12/18/12.

16

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION


EXHIBIT B

## DISMISSAL AND NOTICE OF RIGHTS

To:     **Brandi L. Carter**
        **16135 Grover St**
        **Omaha, NE 68130**

From:   **St. Louis District Office**
        **1222 Spruce Street**
        **Room 8.100**
        **Saint Louis, MO 63103**

[  ]    *On behalf of person(s) aggrieved whose identity is*
        *CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **32E-2015-00224** | **Joseph J. Wilson,**<br>**State & Local Program Manager** | **(314) 539-7816** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[  ]    The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[  ]    Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[  ]    The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[  ]    Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[  ]    The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[X]     The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[  ]    Other *(briefly state)*

## - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

_____
James R. Neely, Jr.,
**Director**

December 17, 2015
*(Date Mailed)*

Enclosures(s)

cc:     **James R. Thibodeau**
        **Director of Labor Relations/General Counsel**
        **METROPOLITAN COMMUNITY COLLEGE AREA**
        **PO Box 3777**
        **Omaha, NE 68103**

        **Terry A. White/Alexis Mullaney**
        **CARLSON & BURNETT**
        **17525 Arbor Street**
        **Omaha, NE 68130**