# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **BRANDI CARTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **8:16CV44** |
| | ) | |
| **METROPOLITAN COMMUNITY** | ) | **MEMORANDUM AND** |
| **COLLEGE, a political subdivision of** | ) | **ORDER** |
| **the State of Nebraska and body** | ) | |
| **corporate and politic,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This matter is before the court on the Motion for Summary Judgment (Filing No. 23) filed by Defendant, Metropolitan Community College ("MCC") and the Motion to Strike the Transcript of Pebley Interview (Filing No. 35) filed by Plaintiff, Brandi Carter. For the reasons explained below, the court will grant the motion for summary judgment. The court will deny as moot Plaintiff's motion to strike because the court's summary judgment ruling is not based on any evidence contained in the exhibit Plaintiff requests be stricken.

## FACTS

Unless otherwise noted, the following facts were presented in the parties' briefs, Filing Nos. 24, 37, and 40, and supported by pinpoint citations to admissible evidence in the record.  The parties have admitted these facts, or have not properly controverted them as required by NECivR 56.1[1] and Federal Rule of Civil Procedure 56.

Plaintiff is a Caucasian female residing in Omaha, Nebraska.  Defendant MCC is a political subdivision of the State of Nebraska.  In September 2009, Plaintiff began her

---

[1] See NECivR 56.1(b)(1) (effective December 1, 2016).  Properly referenced material facts "are considered admitted unless controverted in the opposing party's response."

1

employment with MCC as a part-time Health & Public Services Specialist, working 18-20 hours per week.   At all times while Plaintiff was employed by MCC, she was supervised by Dean Stacey Ocander ("Dean Ocander"), a female.   Plaintiff's duties as a part-time employee included helping individuals enroll in certified nurse assistant classes, assisting Erin Olson ("Ms. Olson") (who was at that time the associate to the dean's office), answering phones and greeting students, and generally doing whatever Dean Ocander wanted her to do.   Plaintiff testified she has Epstein-Barr Syndrome, and informed Dean Ocander of this diagnosis sometime in 2012.   (Filing No. 32-3 at pp. 117-118).

Beginning in 2013, and during the remainder of her part-time employment, Plaintiff worked in an office suite with Dean Ocander, Ms. Olson (during January 2013), Tina Pebley (who replaced Ms. Olson after January 2013), Jessica Vanderloo, Laura Leach, and Kay Robinson (who was later replaced by Kelly Grammer).   All the employees in the office suite were female.

Plaintiff applied for and was hired by Dean Ocander for a full-time faculty secretary position, effective July 23, 2014.   The previous full-time faculty secretary, Lauri Cook ("Ms. Cook"), was female.   At or near the time Plaintiff applied for the full-time position, on July 8, 2014, she signed a "Voluntary Self-Identification of Disability" form provided to her by MCC, checking the box that said, "No, I don't have a disability."   (Filing No. 31-2 at p. 3; Filing No. 31-5).

In Plaintiff's full-time position from July 23, 2014, through the date of her termination on November 4, 2014, she worked in the same building she had worked in as a part-time employee, but in a different office.   In the full-time position, Plaintiff performed secretarial duties and provided general secretarial support for the faculty.   Plaintiff testified that her working hours were originally set at 8:00 a.m. to 5:00 p.m., with one hour for lunch.   (Filing No. 32-3 at p. 27).   Plaintiff testified Dean Ocander permitted Plaintiff to change her start time to 8:30 a.m. so that Plaintiff could drop her children off at school in the morning.   (Filing No. 32-3 at pp. 27-28).

2

At all times during Plaintiff's employment with MCC, MCC had a "Policy Prohibiting Harassment of Employees & Discrimination."  MCC's harassment policy provided, "Employees who believe they have been subjected to unlawful discrimination or harassment should file a complaint with Associate Vice President for Equity and Diversity, the College's General Counsel, or the Associate Vice President of Human Resources ("HR")."  MCC's harassment policies were freely available and accessible online to employees of MCC, including Plaintiff, and members of the general public.  During Plaintiff's employment with MCC, Cynthia Good was MCC's Associate Vice President for Equity and Diversity, James Thibodeau was MCC's General Counsel, and Maureen Moeglin ("Ms. Moeglin") was MCC's Associate Vice President of Human Resources. Plaintiff never filed a complaint of discrimination/harassment with, or complained about, Dean Ocander's treatment of employees to any of the above three designated individuals.

**Specific Allegations of Hostile Work Environment**

Plaintiff alleges that between September and October 2009, Dean Ocander made statements to Plaintiff that she "needed a vibrator" and that Dean Ocander would take Plaintiff "across the bridge [in reference to Council Bluffs, Iowa] to get one."  (Filing No. 32-3 at p. 139).  Plaintiff further alleges during her part-time employment, "Dean Ocander often walked in an exaggerated, bowlegged manner through the office . . . saying she overused her vibrator the night before."

Plaintiff alleges that on at least 20 occasions, Dean Ocander called the employees and the staff in the office area a "bunch of hookers."  Plaintiff did not know the last time she heard Dean Ocander use the expression and did not know whether she heard Dean Ocander use that expression during Plaintiff's full-time employment.  According to Dean Ocander, neither she nor other staff members used the expression other than in a joking or endearing manner.

Plaintiff alleges Dean Ocander used the phrase "f--k me running" in the workplace on multiple occasions.  Plaintiff never heard Dean Ocander direct the expression at

3

Plaintiff or anyone else.   Plaintiff and others in the workplace also used the "F-word" here and there in the workplace.   In Plaintiff's opinion, Dean Ocander's use of the expression was "vulgar and implie[d] something of a sexual nature," while Plaintiff's use of the f-word as an expletive was different.

Plaintiff alleges that on five to ten occasions beginning in 2012, Dean Ocander sat in the office suite near Plaintiff's assigned desk and talked "for hours" about Dean Ocander's ex-husband and his "whore" or "c--t" girlfriend.

Plaintiff alleges that on two or three occasions during her part-time employment, Dean Ocander briefly lifted up her own skirt exposing her "private parts" to all the employees/staff in the office area.   Plaintiff testified that by "private parts," she meant she could see Dean Ocander's nylons and her underwear.   (Filing No. 32-3 at p. 75).   Plaintiff could not recall the last time she saw this occur.

Plaintiff alleges that on two occasions in 2014, Dean Ocander joked to a new employee about having failed MCC's sexual harassment training, and on one occasion shouted to the entire office in a self-congratulatory tone that she failed her sexual harassment training.   Plaintiff admitted she understood those statements to be jokes.

Plaintiff alleges that sometime between 7:00 p.m. and 8:30 p.m. on October 1, 2014, she participated in a group text message with Dean Ocander and the other employees from the office in which Dean Ocander referred to Ms. Pebley and Ms. Vanderloo as "ass wipes," referred to all staff/employees as "hookermeat wipes," and also wrote, "jerk bait keep singing for your mate, damn I can't rhymth [sic] screw it."

Finally, Plaintiff alleges that on two occasions during her part-time employment, Ms. Olson walked through the office area with a plastic penis as part of a "ring toss" game. Plaintiff testified Ms. Olson was "made" to do it, although Plaintiff did not know how it came about.   (Filing No. 32-3 at pp. 92-93).

Plaintiff admits she never indicated to Dean Ocander that Plaintiff found any of the above behavior distasteful or offensive.   Plaintiff also admits she never complained about or reported Dean Ocander's behavior to MCC.   Plaintiff did indicate to her coworkers,

4

Ms. Cook, Ms. Olson, Laura Leach, Kay Robinson, Ms. Vanderloo, Ms. Pebley, and Peggy Dean, that Plaintiff found Dean Ocander's use of the expression "f--k me running" offensive.    Plaintiff also indicated she "would have said something" to Ms. Cook about Dean Ocander's discussions regarding her ex-husband.

Plaintiff asserts she did not complain about any of Dean Ocander's behavior because she "didn't feel safe."   (Filing No. 32-3 at p. 77).   Plaintiff testified that Dean Ocander would be "nasty" to Plaintiff and "give privileges to other people and not me" if Plaintiff "acted like [she] was not interested in what [Dean Ocander] had to say or her stories or her antics or anything[.]"   (Filing No. 32-3 at p. 76).   Plaintiff also submitted an affidavit from Ms. Olson, who stated that on one occasion, Ms. Olson reported Dean Ocander's "unethical business practices" to Ms. Moeglin, MCC's Associate Vice President of Human Resources.   In her affidavit, Ms. Olson does not specify what the "unethical business practices" were.   Shortly after Ms. Olson's report, Dean Ocander called Ms. Olson, "furious."   Ms. Olson stated that in the following weeks, Dean Ocander avoided Ms. Olson, glared in Ms. Olson's direction, excluded Ms. Olson from daily activities, and communicated with Ms. Olson through email only.   Ms. Olson resigned her employment in January 2013 "due to Ocander's harassment of and retaliation against me for having reported her."   (Filing No. 37-1 at pp. 1-2).

If Plaintiff ever indicated to anyone at MCC that Dean Ocander's behavior or language were offensive, distasteful, or unwelcome, Dean Ocander was not aware of it. Plaintiff does not claim that anyone other than Dean Ocander harassed her.

**Allegations Regarding Retaliation**

Plaintiff claims that when she was a part-time employee, Dean Ocander treated Plaintiff differently from Ms. Vanderloo, Ms. Leach, and Ms. Cook.   When Plaintiff was a full-time employee, she asked permission from Dean Ocander to work through lunch periods so she could leave work early every day to pick up her children.   Plaintiff testified Dean Ocander allowed Plaintiff's predecessor, Ms. Cook, to work through lunch periods.

Plaintiff did not know if Ms. Cook was allowed to do so every day.   Plaintiff was unable to say why Dean Ocander treated Plaintiff differently.

Plaintiff claims that after she was told she could not work through her lunch period every day, she contacted MCC's HR by phone sometime between August and October 2014.   Plaintiff does not recall or know with whom she spoke.   Plaintiff testified she called to ask whether MCC had a written policy on working through lunch.   Plaintiff was told there was no policy or state law on the subject and the ultimate decision was up to the individual supervisor.   Plaintiff testified she called HR just to ask the question about lunch, not to complain.   Plaintiff told Dean Ocander what HR had told her about lunch, and Dean Ocander stated, "yeah, I know, they already--I already talked to them."

Plaintiff alleges MCC failed to provide her with training opportunities.   Plaintiff testified she received no training for her new position other than what her predecessor, Ms. Cook "was able to give" her.   Plaintiff testified she learned the job by reading the faculty secretary manual and asking questions.

**Plaintiff's Termination and Procedural History**

Dean Ocander terminated Plaintiff involuntarily from her employment with MCC effective November 4, 2014.   MCC's stated reason for terminating Plaintiff's employment was that her performance and attendance were not acceptable.   Dean Ocander testified that she provided Plaintiff with an oral warning regarding her attendance and made a note in Plaintiff's attendance records, but did not provide Plaintiff with a formal written warning.   (Filing No. 37-6 at pp. 4-6).   Plaintiff testified she did not receive counseling or a written warning prior to her termination.   (Filing No. 32-3 at p. 122).   Dean Ocander emailed Mr. Thibodeau and Ms. Moeglin on October 31, 2014, outlining Dean Ocander's concerns with Plaintiff's attendance and sought their support for her decision to terminate Plaintiff's employment.   (Filing No. 32-7).   Plaintiff does not believe she had any deficiencies in her work and adequately performed her duties.   Dean Ocander hired a female, Rebekah Poole, to replace Plaintiff after her termination.

At the time Plaintiff was discharged, she had not filed any discrimination charge or testified in any discrimination proceeding.

On December 29, 2014, Plaintiff filed a Charge of Discrimination against MCC with the Nebraska Equal Opportunity Commission (NEOC) and the United States Equal Employment Opportunity Commission (EEOC), and that is the only charge Plaintiff filed against MCC. Plaintiff never amended the charge. On her Charge of Discrimination, in the space labeled "CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))," Plaintiff checked the boxes for sex and retaliation, but did not check the box identifying disability as a basis of discrimination. In the textual narrative of Plaintiff's charge, setting forth the particulars of the charge, Plaintiff stated, "I believe I have been discriminated against on the basis of sex and retaliation," and did not mention disability discrimination.

Carter filed this action against MCC on January 25, 2016, alleging: (1) she was subjected to a hostile work environment on the basis of her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, and the Nebraska Fair Employment Practices Act, Neb. Rev. Stat. § 48-1101, et seq. ("NFEPA"); (2) MCC discriminated against her on the basis of her disability, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA") and NFEPA; and (3) that MCC retaliated against her in violation of the anti-retaliation provisions of Title VII, 42 U.S.C. § 2000e(3)(a) and the NFEPA, Neb. Rev. Stat. § 48-1114. (Filing No. 1 at pp. 5-8).

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "Summary judgment is appropriate when, construing the evidence most favorably to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Crozier v. Wint*, 736 F.3d 1134, 1136 (8th Cir. 2013) (citing Fed. R. Civ. P. 56(c)). "Summary Judgment is not disfavored

7

and is designed for every action." *Briscoe v. Cty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (internal quotation marks omitted). In reviewing a motion for summary judgment, the court will view "all evidence and mak[e] all reasonable inferences in the light most favorable to the nonmoving party." *Inechien v. Nichols Aluminum, LLC*, 728 F.3d 816, 819 (8th Cir. 2013) (citing *Williamson v. Hartford Life & Acc. Ins. Co.*, 716 F.3d 1151, 1153 (8th Cir. 2013).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact." *Id.* at 325. Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Briscoe*, 690 F.3d at 1011 (quoting *Torgerson*, 643 F.3d at 1042) (internal quotation marks omitted). "'[T]he mere existence of some alleged factual dispute between the parties'" will not defeat an otherwise properly supported motion for summary judgment. *Quinn v. St. Louis Cty.*, 653 F.3d 745, 751 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 972 (8th Cir. 2012) (quoting

*Torgerson*, 643 F.3d at 1042) (internal quotation marks omitted).   Otherwise, where the court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue for trial" and summary judgment is appropriate.   *Torgerson*, 643 F.3d at 1042 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)) (internal quotation marks omitted).

## DISCUSSION

### I.  Disability Discrimination

Plaintiff claims that MCC discriminated against her on the basis of her disability, Epstein-Barr Syndrome, in violation of the ADA and NFEPA.  MCC seeks summary judgment on this claim because Plaintiff failed to exhaust her administrative remedies.

To pursue claims under the ADA, a plaintiff must first exhaust her administrative remedies.   See 42 U.S.C. § 12117(a) (stating that the remedies and procedures set forth in Title VII, including those pertaining to exhaustion, apply to disability discrimination claims).  A plaintiff is required to seek relief through the EEOC or the NEOC prior to filing suit in this court.  See *Burkett v. Glickman*, 327 F.3d 658, 660 (8th Cir. 2003) ("Before the federal courts may hear a discrimination claim, an employee must fully exhaust [her] administrative remedies.").   The NFEPA also requires a plaintiff to exhaust her statutory administrative remedies, unless the plaintiff's claim falls under Neb. Rev. Stat. § 20-148, which provides an independent cause of action for violations of NFEPA. See *Goolsby v. Anderson*, 549 N.W.2d 153, 158 (Neb. 1996); *Parrish v. Immanuel Med. Ctr.*, 92 F.3d 727, 734 (8th Cir. 1996).   However, Neb. Rev. Stat. § 20-148 specifically excludes political subdivisions from its provisions.   It is undisputed that MCC is a political subdivision.   Without Neb. Rev. Stat. § 20-148, NFEPA's review scheme offers the only remedy for a plaintiff's claim.   "In construing the NFEPA, Nebraska courts have looked to federal decisions, because the NFEPA is patterned after Title VII . . . ."  *Orr v. Wal-Mart Stores, Inc.*, 297 F.3d 720, 723 (8th Cir. 2002) (citing *Father Flanagan's Boys'*

9

*Home v. Agnew*, 590 N.W.2d 688, 693 (Neb. 1999); *IBP, Inc. v. Sands*, 563 N.W.2d 353, 357-59 (Neb. 1997)).

Plaintiff admittedly did not identify disability discrimination on her "Charge of Discrimination." Instead, she argues her disability discrimination claim is reasonably related to her charge. A court may "deem administrative remedies exhausted as to all incidents of discrimination that are 'like or reasonably related to the allegations of the administrative charge.' " *Tart v. Hill Behan Lumber Co.*, 31 F.3d 668, 671 (8th Cir. 1994) (internal alterations omitted) (quoting *Anderson v. Block*, 807 F.2d 145, 148 (8th Cir. 1986)). Accordingly, "the scope of the civil suit may be 'as broad as the scope of the administrative investigation which could reasonably be expected to grow out of the charge of discrimination.'" *Id.* (internal alterations omitted) (quoting *Cobb v. Stringer*, 850 F.2d 356, 359 (8th Cir. 1988)). But while the court may liberally construe an administrative charge for exhaustion of remedies purposes, "there is a difference between liberally reading a claim which lacks specificity, and inventing, *ex nihilo*, a claim which simply was not made." *Sellers v. Deere & Co.*, 791 F.3d 938, 943 (8th Cir. 2015) (quoting *Parisi v. Boeing Co.*, 400 F.3d 583, 585-86 (8th Cir. 2005)).

In this case, the "Charge of Discrimination" form Plaintiff filled out for the NEOC and EEOC included several check-boxes for the "cause of discrimination" being alleged. Plaintiff checked the boxes for sex discrimination and retaliation, but did not check the box identifying disability as a basis of discrimination. In the textual narrative of Plaintiff's charge, setting forth the particulars of the charge, Plaintiff stated, "I believe I have been discriminated against on the basis of sex and retaliation," but did not mention disability discrimination. Nothing in Plaintiff's charge, legally or factually, suggests or alludes to a claim based on disability discrimination in violation of the ADA or NFEPA. The NEOC interpreted Plaintiff's charge the same way, issuing determinations regarding Plaintiff's sex and retaliation discrimination charges, and not any disability discrimination charge. Plaintiff's charge contains nothing upon which the NEOC or EEOC could have been expected to investigate disability discrimination. The scope of a civil suit may be as broad

10

as the scope of the administrative investigation which could reasonably be expected to grow out of the charge of discrimination, see *Tart*, 31 F.3d at 671, but it cannot be broader. Because Plaintiff has failed to administratively exhaust her disability discrimination claim, the court will grant summary judgment in favor of MCC on this claim.

## II.   Sex Discrimination under Title VII and NFEPA

Plaintiff alleges MCC discriminated against her on the basis of her sex, in particular due to a hostile work environment, in violation of Title VII and NFEPA.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(1).   Discrimination includes inappropriate conduct that creates a hostile work environment.   See 29 C.F.R. § 1604.11(a)(3); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).   The NFEPA provides similar protections.   See Neb. Rev. Stat. § 48-1104 and Neb. Rev. Stat. § 48-1102(14).   The NFEPA "is patterned after Title VII," and, therefore, "it is appropriate to consider federal court decisions construing the federal legislation" when considering questions under the NFEPA.   *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1039 (8th Cir. 2005) (citing *City of Fort Calhoun v. Collins*, 500 N.W.2d 822, 825 (Neb. 1993); *Orr v. Wal-Mart Stores, Inc.*, 297 F.3d 720, 723 (8th Cir. 2002)).   Therefore, the court will jointly analyze Plaintiff's sex discrimination claims under Title VII and the NFEPA, applying federal standards.

"To establish the elements of a sexual harassment claim based on a hostile environment, a plaintiff must show that: (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take proper remedial action." *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016) (citing *Schmedding v. Tnemec Co.*, 187 F.3d 862, 864 (8th Cir. 1999)).   MCC does not dispute that Plaintiff is a member of a

11

protected class, and the court finds that she is.   MCC does, however, argue that Plaintiff cannot establish the second, third, and fourth elements of a prima facie case of hostile work environment, that MCC is entitled to the *Ellerth/Faragher* affirmative defense, and that MCC is therefore entitled to summary judgment as a matter of law.

### A. Unwelcome Harassment

"[H]arassing conduct is considered unwelcome if it was "'uninvited and offensive.'" *Jenkins v. Univ. of Minnesota*, 838 F.3d 938, 945 (8th Cir. 2016) (quoting *Quick v. Donaldson*, 90 F.3d 1372, 1378 (8th Cir. 1996)).   "The proper inquiry is whether the plaintiff indicated by her conduct that the alleged harassment was unwelcome." *Id.* An employee may not consider herself subject to "unwelcome" harassment if the employee did not complain about the alleged harassment or otherwise make timely reports to a supervisor.   See *Stuart v. General Motors Corp.*, 217 F.3d 621, 632 (8th Cir. 2000) (assuming the other elements were met, plaintiff's hostile-work-environment claim failed because plaintiff did not complain about any of the alleged incidents of sexual harassment).

Plaintiff has failed to submit evidence that Dean Ocander's alleged harassment was "unwelcome."   Plaintiff admits that during the five years she was employed by MCC, she never complained to Dean Ocander or MCC about any of Dean Ocander's behavior or language.   Plaintiff does not dispute that Dean Ocander was unaware that Plaintiff found Dean Ocander's behavior or language offensive, distasteful, or unwelcome.   (Filing No. 37 at p. 23).   Instead, Plaintiff claims she never complained to MCC or Dean Ocander because Plaintiff feared retaliation.   Generally, fear of retaliation is not a proper excuse for an employee's failure to report sexual harassment.   *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 422 (8th Cir. 2010).   "[A]n employee may be excused for a delay in reporting harassment, if the employee can 'demonstrate a truly credible threat of retaliation'" *Id.* (quoting *Weger v. City of Ladue*, 500 F.3d 710, 725 (8th Cir. 2007)). "[A]n employee's subjective fears of confrontation, unpleasantness or retaliation do not

alleviate the employee's duty . . . to alert the employer to the allegedly hostile environment." *Weger*, 500 F.3d at 725.

The record does not contain evidence of a credible threat of retaliation by MCC alleviating Plaintiff of her duty to alert MCC to the allegedly hostile environment.   As a basis for Plaintiff's fear of retaliation, she refers to Ms. Olson's affidavit wherein Ms. Olson avers she reported Dean Ocander's "unethical business practices" to MCC's Associate Vice President of Human Resources and was subsequently "retaliated" against by Dean Ocander.   However, there is no information that Ms. Olson reported harassment; rather, Ms. Olson only stated she reported Dean Ocander's "unethical business practices." Additionally, the "retaliation" described by Ms. Olson appeared to be confrontation and unpleasantness in the office, including Dean Ocander's use of emails only to communicate with Ms. Olson.   Finally, even assuming Ms. Olson's affidavit provides evidence of a credible threat of retaliation for reporting harassment, Ms. Olson's experience occurred near the end of 2012 until she resigned in January 2013.   Plaintiff alleges Dean Ocander's harassment began in 2009--three years prior to learning about Ms. Olson's experience.

The court concludes the record does not support a finding that Plaintiff demonstrated Dean Ocander's conduct was unwelcome, and thus Plaintiff cannot establish the second prong of her prima facie case of hostile work environment.

### B. Causal Link Between Harassment and Sex

MCC also argues Plaintiff cannot establish that any harassment was based on her sex.   "Harassing conduct constitutes discrimination based on sex when members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 737 (8th Cir. 2000).   Plaintiff, a female, alleges she was harassed solely by Dean Ocander, also a female.   There are three evidentiary routes by which a same-sex plaintiff can show that the conduct was based on sex.   See *McCown v. St. John's Health Sys.*, 349 F.3d 540, 543 (8th Cir. 2003) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)).

13

"First, a plaintiff can show that the conduct was motivated by sexual desire." *Id.* "Second, a plaintiff can show that the harasser was motivated by a general hostility to the presence of the same gender in the workplace." *Id.* "[T]hird, a plaintiff may offer direct comparative evidence about how the harasser treated both males and females in a mixed-sex workplace." *Id.* "[W]hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* . . . because of . . . sex.'" *Id.* (quoting *Oncale*, 523 U.S. at 81)(emphasis in original).

Plaintiff has provided no evidence that Dean Ocander's conduct was based on sex. First, Plaintiff does not argue, nor does the record contain, evidence that Dean Ocander was motivated by sexual desire towards Plaintiff. Nor is there evidence that Dean Ocander was motivated by a general hostility to the presence of females in the workplace: all of the employees in the office during the relevant time period were female, Plaintiff was hired by Dean Ocander to replace a female employee, and Dean Ocander hired a female employee to replace Plaintiff. Although Dean Ocander may have used crude gender-specific comments such as calling the women in the office "a bunch of hookers," "[C]rude gender-specific vulgarity is not, by itself, probative of gender discrimination." *McCown*, 349 F.3d at 543 (citing *Linville v. Sears, Roebuck & Co.*, 335 F.3d 822, 824 (8th Cir. 2003)(per curiam)). Finally, Plaintiff offered no comparative evidence about how Dean Ocander treated both males and females in a mixed-sex workplace. Dean Ocander's conduct may have been crude and vulgar, but there is no evidence in the record to demonstrate that Dean Ocander's conduct towards Plaintiff was based on sex, and thus Plaintiff cannot establish the third prong of her prima facie case of hostile work environment.

### C. Affected a Term, Condition, or Privilege of Employment

MCC also argues that Plaintiff cannot establish that the alleged harassment affected a term, condition, or privilege of her employment. This element "involves both objective

14

and subjective components" and requires that "[t]he harassment . . . be 'severe or pervasive enough to create an objectively hostile or abusive work environment' and the victim must subjectively believe her working conditions have been altered." *Blomker*, 831 F.3d at 1056 (quoting *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 801 (8th Cir. 2009)). "This element presents a high threshold, requiring a showing that 'the workplace [was] permeated with discriminatory intimidation, ridicule, and insult.'" *Williams v. Herron*, 687 F.3d 971, 975 (8th Cir. 2012) (quoting *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 934 (8th Cir. 2002)). "The Supreme Court has cautioned courts to be alert for workplace behavior that does not rise to the level of actionable harassment." *Al-Zubaidy*, 406 F.3d at 1038. Therefore, "[t]he standards for a hostile environment are demanding, and 'conduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment.'" *Id.* (quoting *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003)).

To determine whether the conduct complained of was sufficiently severe or pervasive, a court considers "the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Williams*, 687 F.3d at 975-76 (quoting *Duncan*, 300 F.3d at 934). "More than a few isolated incidents are required," *Blomker*, 831 F.3d at 1057, although "a series of individual episodes of inappropriate behavior eventually can amount to a hostile environment." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 421 (8th Cir. 2010).

Even viewing the facts in the light most favorable to Plaintiff, the court finds that Dean Ocander's conduct was not so severe or pervasive to satisfy the high threshold for a sexual harassment claim based on hostile work environment. First, none of Dean Ocander's conduct included physically threatening Plaintiff. Additionally, much of Dean Ocander's conduct was not targeted specifically at Plaintiff, but rather was directed to the office as a whole: Dean Ocander frequently used the phrase "f--k me running" in the office,

referred to all the employees in the office as a "bunch of hookers," flashed her underwear to all the employees in the office on two or three occasions, discussed her ex-husband's "whore" and "c--t" girlfriend near Plaintiff's office, joked to the whole office that she had failed sexual harassment training, and used crude language to describe two other employees in a group text.   The plastic penis "ring toss" game occurred in the office on only two occasions sometime between 2009 and 2014 (as Plaintiff testified this happened during her part-time employment), and was carried out by Ms. Olson, not Dean Ocander (although Plaintiff believes Dean Ocander set Ms. Olson up to do it).   Dean Ocander's references to vibrators, while crude and vulgar, occurred early in Plaintiff's employment over a two month period compared to Plaintiff's total of five years of employment. Although Dean Ocander's conduct may have been unprofessional, "Title VII does not prohibit all verbal or physical harassment" and is not "a general civility code for the American workplace."   *Nitsche v. CEO of Osage Valley Elec. Co-op.*, 446 F.3d 841, 846 (8th Cir. 2006) (quoting *Oncale*, 523 U.S. at 80).

The Supreme Court "implores lower courts to apply the demanding harassment standards to filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Al-Zubaidy*, 406 F.3d at 1039 (quotations and citations omitted).   The Eighth Circuit has found summary judgment proper in numerous cases under facts much more egregious than the circumstances of this case.   See, e.g., *Duncan*, 300 F.3d at 934-35 (determining, as a matter of law, that plaintiff failed to show severe or pervasive sexual harassment during a two-year period during which plaintiff was propositioned for a relationship; improperly touched on the hand on multiple occasions; requested to sketch a sexually objectionable planter; requested to "type the He-Men Women Haters beliefs," and was subjected to a "Man Hater's Club" poster);   *Anderson v. Family Dollar Stores of Ark., Inc.*, 579 F.3d 858, 862 (8th Cir. 2009) (finding no sufficiently severe or pervasive conduct where a supervisor occasionally rubbed the plaintiff's shoulders and back, called her "baby doll," accused her of not wanting to be "one of [his] girls," suggested she should be in bed with

16

him and a drink in Florida, and insinuated that she could advance in the company if she "got along" with him); and *Alagna*, 324 F.3d at 977-78, 980 (finding no sufficiently severe or pervasive conduct over a two-year period where employer regularly called plaintiff's home, frequently visited her office, discussed relationships with his wife and other women, touched plaintiff's arm, said he "loved" her and she was "very special," placed romance novels in her faculty mailbox, and invaded her personal space).

In this case, Plaintiff has not presented evidence of sexual harassment sufficient for a reasonable jury to conclude that the conditions of her employment were altered by the creation of an abusive working environment, particularly in consideration of Eighth Circuit precedent.  Reviewing the totality of the circumstances, Plaintiff has not presented a genuine issue of material fact as to the fourth prong of her prima facie case, whether her work environment was one that a reasonable person would find hostile or abusive.

In sum, the court finds Plaintiff cannot establish the second, third, or fourth prongs of a prima facie case of hostile work environment.   As such, the court finds it unnecessary to address MCC's claim that the *Ellerth/Faragher* affirmative defense applies. Accordingly, judgment will be granted in favor of MCC on Plaintiff's claim of sexual discrimination.

## III.   Retaliation

Plaintiff alleges her employment with MCC was terminated in retaliation for taking "her complaints about unequal treatment to [MCC's] HR Department" in violation of the anti-retaliation provisions of Title VII and the NFEPA.   (Filing No. 1 at p. 8).

Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII] . . . or participated in any manner in an investigation . . . under [Title VII]." 42 U.S.C. § 2000e–3(a).   A retaliation claim follows the same direct evidence or burden-shifting analysis employed in discrimination claims. *EEOC v. Prod. Fabricators, Inc.*, 763 F.3d 963, 972 (8th Cir. 2014).   "A prima facie case of retaliation requires the plaintiff to show (1) she

17

engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the two." *Oehmke v. Medtronic, Inc.*, 844 F.3d 748 (8th Cir. 2016). Courts "apply the retaliation provisions of § 2000e-3(a) broadly to cover opposition to employment actions that are not unlawful, as long as the employee acted with a good faith, objectively reasonable belief that the practices were unlawful." *Blomker*, 831 F.3d at 1059 (citing *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 977-78 (8th Cir. 2012).

Likewise, the NFEPA prohibits an employer from retaliating against an employee "because he or she (1) has opposed any practice made an unlawful employment practice by the [NFEPA], (2) has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the act, or (3) has opposed any practice or refused to carry out any action unlawful under federal law or the laws or this state." Neb. Rev. Stat. § 48-1114. The "practice" in Neb. Rev. Stat. § 48-1114(3) refers to an unlawful practice of the employer. *Wolfe v. Becton Dickinson & Co.*, 662 N.W.2d 599, 603 (Neb. 2003); see, *Bonn v. City of Omaha*, 814 N.W.2d 114, 120 (Neb. Ct. App. 2012). The NFEPA "is not a general 'bad acts' statute[,]" and the statute's purpose is not served by giving an extra layer of protection from discharge to those employees who happen to voice their opposition to any manner of unlawful activity. *Wolfe*, 662 N.W.2d at 603. A retaliation claim under the NFEPA--specifically, § 48-1114(3)--is governed by the same standard as a claim for retaliation under 42 U.S.C. § 1981 or Title VII. *Reyes v. Pharma Chemie, Inc.*, 890 F. Supp. 2d 1147, 1167 (D. Neb. 2012).

Here, the inquiry is straight forward. Plaintiff presented no evidence that she engaged in any statutorily protected activity under Title VII or the NFEPA. Although Plaintiff's complaint alleges that she was retaliated against for taking "her complaints about unequal treatment to [MCC's] HR Department," Plaintiff's own deposition testimony reflects she called HR simply to inquire whether MCC had a written policy on working through lunch. Plaintiff testified she called HR on one occasion just to ask the question about lunch, not to complain. Plaintiff's inquiry regarding MCC's lunch hour

18

policy does not constitute statutorily protected activity under the NFEPA or Title VII. Even if Plaintiff's "question" regarding a lunch hour policy is considered protected activity, nothing in the record establishes any kind of casual connection between Plaintiff's termination or lack of training opportunities and her question.   Because Plaintiff failed to establish a prima facie case of retaliation, MCC is entitled to judgment on that claim.

## IV. Conclusion

Viewing the facts in the light most favorable to Plaintiff, no genuine disputes of material fact remain for trial, and judgment as a matter of law will be entered in favor of MCC.   Accordingly,

**IT IS ORDERED:**

1.  Plaintiff Brandi Carter's Motion to Strike the Transcript of Pebley Interview (Filing No. 35) is denied as moot;

2.  Defendant Metropolitan Community College's Motion for Summary Judgment (Filing No. 23) is granted;

3. Plaintiff Brandi Carter's Complaint is dismissed, with prejudice;

4. A separate judgment will be entered.


**DATED: January 31, 2017**


**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**

19